THE STATE OF OHIO, APPELLEE, *v.* LAMONGE, APPELLANT.*

---

*Motion for leave to appeal overruled, May 15, 1963. Appeal dismissed, 174 Ohio St., 545.

(No. 1530—Decided November 29, 1962.)

*Mr. Lynn B. Griffith, Jr.*, prosecuting attorney, for appellee.
*Mr. John Spain*, for appellant.

RADCLIFF, P. J. A full understanding of this case necessitates a review of the history of the Warren Sewer Improvement Project, particularly that portion known as Phases B and C. Phase B consists generally of the construction of a sewer to collect storm water and deposit it in the Mahoning River, thus diverting the same out of the Warren Sanitary Sewer System. Phase C involves the construction of a sewer generally following the path of the Mahoning River. The purpose of this line is to intercept existing sewer lines, collect the sewage presently dumped raw into the Mahoning River by such existing lines, and carry the sewage to a new sewage treatment plant. The cost of these phases of the project is in excess of four million dollars.

The engineering firm of Havens and Emerson, Cleveland, Ohio, was employed by the city of Warren to conduct the necessary surveys, to draw the plans and specifications, and to submit the estimates for this project. In May 1960, after the engineering survey had been completed, the city council of Warren passed an ordinance authorizing the safety-service director to advertise for bids for Phases B and C of the sewer improvement project. The ordinance passed contained no authority for the board of control, *i. e.*, the mayor and the safety-service director, to award a contract on the basis of the bids, nor did it contain any of the necessary fiscal authority to finance the project. It is to be noted that the city council of Warren employed this tripartite legislative technique throughout the period in which the project was to be let. The authority for advertising for bids, the authority for awarding the contract, and the fiscal legislation were each handled by a separate ordinance.

The net effect of this scheme was to give the council control over the contract at three different levels.

First bids were received and opened on August 1, 1960, but council passed no ordinance authorizing the board of control to enter into a contract with the low bidders. Instead, a second advertisement for bids was authorized. These bids were received on October 7, 1960. Again council failed to pass the necessary ordinance authorizing the board of control to award a contract. Bids were received for the third time on March 16, 1961, at which time the Rocco Ferrera Company and the Boam Company of Lavonia, Michigan, bidding together in a joint venture were low bidders on Phase B of the project. The Al Monzo Construction Company of Monroeville, Pennsylvania, was low bidder on Phase C of the project. At this letting, contractors had been invited to submit seperate bids on each phase of the project and also combined bids on both phases. The low bid on the combined bid for both phases had been submitted by the Boam-Ferrera Companies. Havens and Emerson recommended to the city that it accept this combined bid as the lowest and best bid for both phases, even though total dollar cost of the combined bid was slightly in excess of the total of the Ferrera-Boam bid on Phase B and the Monzo bid on Phase C.

On May 5, 1961, the city council passed an ordinance authorizing the board of control to enter into a contract with the Ferrera-Boam Companies on both phases of the project. On June 6, 1961, a contract was signed between the city and the Ferrera-Boam Companies for the construction of Phases B and C.

With this broad outline of the legislative history and of the project in mind, it is now necessary to return and trace the activities of Raymond Little and other members of the Warren City Council during the bidding of the project. Their activities provide the necessary background for the entry of Lamonge into the picture and for his actions which led to his indictment and trial. In the summer of 1960 three members of the Warren City Council, Raymond Little, John Janosik and Jack Flask, initiated a series of meetings with officials of the Ferrera-Boam Companies whom they knew to be interested in bidding on the Warren Sewer Improvement Project, as a joint venture. Of-

ficials of the Ferrera Company included its president, Rocco Ferrera, and Al Cicchini, vice president and secretary. Officials of the Boam Company included Pat Brady and his son, Eugene Brady, its secretary and treasurer. Negotiations on behalf of the Boam Company were carried on by Eugene Brady, while negotiations on behalf of the Ferrera Company were carried on by both Mr. Ferrera and Mr. Cicchini. From the outset the three councilmen made it clear to the officials of the Boam and Ferrera Companies that they were interested, by various corrupt ways and means, in receiving illegal benefits from the Warren Sewer Improvement Project. Meetings took place in various cities. Ways and means were discussed, in general terms, whereby the councilmen could make money from the project. These included direct payments by the contractors upon the award of the contract, the eventual addition of non-existent "extras" (a scheme to be consummated by the device of employing a resident engineer who would recommend certain changes in the basic contract involving the expenditure of additional money and then certify that such "extras" had been put into the job when in fact they had not), and commissions on materials.

By mid April 1961, no specific agreements had been reached between the officials of the Boam-Ferrera Companies as to the ways and means or amounts to be involved in the various forms of illegal payments to the councilmen. The following then is the situation in mid April. From the point of view of the legislation, bids had been made for the third time but the necessary second and third steps of authorizing the board of control to award the contract and to provide financing had not been taken. The contract, of course, had not been signed. Negotiations, as previously stated, between the councilmen and the contractors had not yet resulted in any specific agreements. It is at this point that Frank Cickelli entered the picture. After a preliminary meeting between the officials of the Boam-Ferrera Companies and Mr. Cickelli in Cleveland in mid April, arrangements were made for a meeting to be held on May 7, 1961. This meeting took place at the home of Frank Cickelli. The initial portion of the meeting was concerned with the negotiation of an exact figure to be paid by the contractors in return for their being awarded the contract. It was finally

agreed that the sum of $35,000 would be paid jointly to Cickelli and Little. Following this there were further discussions at the meeting involving other ways and means for getting money into the hands of Cickelli and the councilmen. These conversations concerned the technique to be used in putting fictional "extras" on the job.

It was also at this meeting that Cickelli first indicated that he would take care of contract matters as far as the Mayor of Warren, Walter Pestrak, was concerned. This was a representation which both he and Lamonge made on several other occasions.

Two weeks later, at Cickelli's home in Warren, Brady, Cicchini, and Cickelli held another meeting. The purpose of this meeting was for the contractors to meet the defendant, Paul Lamonge. The defendant was introduced by Cickelli as a trucker. Cickelli requested that the contractors hire Lamonge on the job. After the defendant left, Cickelli pointed out to the contractors that Lamonge could be used in the scheme to affect the payoff. He suggested that since Lamonge was doing the trucking he could present false bills and be paid by the contractors for work not actually performed. The purpose of this plan was to get illegal moneys that could be paid to Cickelli and others out of the companies without income tax being paid thereon. Mr. Little also came to the Cickelli home during this meeting and inquired if the $35,000 agreement was still in effect. He was assured that it was.

Meanwhile city council had passed the necessary legislation; the board of control had awarded the contract to the Boam-Ferrera Companies; and, finally, in July, the city of Warren entered into a written contract with the Boam-Ferrera Companies for the construction of Phases B and C of the Sewer Improvement Project. In the latter part of July 1961, Al Cicchini, who was to be field manager on the job, moved to Warren to set up his office and to make preparation for the beginning of work. During the first couple of weeks in town he was frequently contacted by Cickelli. Cicchini and Cickelli had dinner and meetings together at which meetings Mr. Cickelli again assured Cicchini that he represented the mayor. At one of these meetings, in the latter part of July, Cicchini asked Cickelli to have Paul Lamonge stop in the company office to discuss

trucking.  Lamonge appeared at the Boam-Ferrera office on the afternoon of August 2, 1961.  At this time the defendant indicated to the contractors that he wished to have control of all subcontracting and material purchases; however, the contractors stated they had no such understanding of Lamonge's role in the project.  The defendant immediately placed a call to Frank Cickelli suggesting another meeting with Cicchini and Brady to straighten out the matter.  This meeting was held at the Chateau Restaurant in Warren.  After dinner Cickelli advised the contractors that he had to make a speech in Vienna, Ohio.  He requested that the contractors drive him there so they could discuss business on the way.  On the way to Vienna the defendant insisted that Cickelli make clear to the contractors just what his position was to be.  Finally, Cickelli told the defendant that he was to work hand-in-hand with Cicchini, to do everything for him, and to buy everything for him.

When they reached Vienna the discussion turned to the $35,000 previously agreed upon at the May 7th meeting.  The contractors mentioned having seen Mr. Little.  Cickelli advised them that Little was not to get any of the money but that the contractors were to pay the $35,000 to the defendant, Paul Lamonge, and nobody else.  The contractors objected and stated that this was not the original agreement; however, Cickelli reiterated that Lamonge was to get the money or else someone would get hurt.

Following this, work on the job began in earnest.  Paul Lamonge began to appear on the job daily, suggesting a series of schemes to get control over the purchase of material and the letting of subcontracts.  He demanded from the contractors the prices of material bids from potential suppliers so that before the contracts could be awarded for material or work he could extract "contributions" from the subcontractors and suppliers.

Cickelli, meanwhile, continued to meet with Cicchini, during which time two matters of importance were discussed.  The first of these was an arrangement for a down payment on the $35,000.  It was agreed that the contractors would make a down payment of $10,000 in cash.  The second topic of discussion concerned the ways and means by which the balance of the money could be paid, the problem being the same one which had

existed from the beginning, that of getting a large sum of money in and out of the corporation without an undue tax burden. It was finally suggested at a meeting of Cickelli, Cicchini, Lamonge and Brady that a sales commission could be paid on the material purchased. The obvious source was the purchase of the concrete pipe, as the job called for over one million dollars worth of this material. It was pointed out that an arrangement could be made to have a sales commission paid by the company supplying the pipe to a firm of Mr. Cickelli's choosing, so that he could get the money. In accordance with this plan, Cickelli introduced Mr. Cicchini to an official of a company known as the M & W Sales Corporation and told Cicchini that the commission could be paid to them. The M & W Sales Corporation had nothing to do with the supplier, American Vitrified Pipe Company. Actually, the contract had already been entered into sometime previously by Cicchini; however, this dummy arrangement was set up in order to enable the money to be paid to Cickelli. Through all these meetings in August, Cickelli continued to indicate to Cicchini and Brady that he represented the mayor. Meanwhile, Lamonge also told the contractors that he and Cickelli would take care of matters as far as Mayor Walter Pestrak was concerned. Lamonge also requested of the contractors that he be introduced to Havens and Emerson's resident engineer, Howard Brown, for the purpose of getting a program of fictional "extras" started.

Though he had agreed, Cicchini was concerned by the change in arrangement for the payment of the money originally scheduled to go to Little and Cickelli and now to be paid to Lamonge. He, therefore, stalled the payment of any sum until the return from Europe of his company president, Rocco Ferrera. Upon Mr. Ferrera's return, a meeting was arranged between Cicchini, Ferrera and Cickelli. They met at Cickelli's house, and again Cickelli insisted that the money be paid to Lamonge. In addition, there was a subsequent meeting at a local restaurant at which Cickelli again brought up the subject of subcontractors. He stated that he wished to send subcontractors around, and that if they would get contracts, contributions would be obtained from them in return for their getting the work.

Acting on the statements of Cickelli and Lamonge that they represented Mayor Walter Pestrak, the contractors paid the sum of $5,000 to Paul Lamonge on August 22, at the field office of the Ferrera-Boam Construction Company. On August 27th, an additional $5,000 was given to the defendant in the Warner Hotel room of Cicchini.

The contractors felt that they had met $10,000 of their $35,000 obligation, and that the other $25,000 would be forthcoming from the sales commission to be paid to the M & W Company. The events of August 29th, however, showed that Cickelli and the defendant, Lamonge, had no intention of being satisfied with $35,000.

In order to explain the background of the events of August 29th, it must be remembered that at the third bidding, Monzo Construction Company had been low bidder on Phase C. When the contract was awarded to Boam-Ferrera, Monzo Construction Company brought suit to set the contract aside and to award the contract for Phase C to Monzo Construction Company. (See *State, ex rel. Al Monzo Construction Co., Inc.,* v. *Board of Control of City of Warren,* 172 Ohio St., 370.) As a result of his lawsuit, negotiations had been carried on between Al Monzo and Eugene Brady, with the view to subletting some of the work to Monzo as a means of settling the suit. On this discussion of subletting, approximately one million dollars worth of work on Phase C was to go to Monzo Construction Company in return for which Monzo would drop its suit.

Having learned of these negotiations between Brady and Monzo, Lamonge came to the Ferrera-Boam offices in Warren on August 29th and demanded that Al Cicchini tell him why he had not been informed of this. He claimed that he was to have control of the letting of all subcontracts for the purpose of obtaining contributions from each and every subcontractor. Cicchini insisted that this was not the case and that the only promise he had made was that subcontractors sent by Cickelli would be awarded the work, providing their price was competitive. Lamonge continued to insist that he have control over all subcontracts. Heated arguments followed. After threatening Eugene Brady, Lamonge again suggested that Cickelli be contacted to confirm Lamonge's role on the job. Lamonge and the contractors went to the Cickelli home but did not see Cickelli.

Lamonge stated that a note he showed the contractors had been written by Cickelli, which note indicated that whatever Lamonge wanted should be done by the contractors. The following noon Paul Lamonge came to the office of the Ferrera-Boam Companies looking for Eugene Brady. He brought with him four cars, which he stated were filled with his "boys" who were ready to take care of Gene Brady. Brady was not at the office. Lamonge showed the cars and men to Mike Ferrera, son of Rocco Ferrera, and told the young man it was lucky for Brady that he was not there.

When Cicchini and Brady returned from lunch they received a report of this visit from Mike Ferrera and almost simultaneously Lamonge returned to the office. He immediately made it clear that his intended purpose in coming to the office was to bring the contractors into line by threats. He returned $5,000 to Brady and told him to get out of town within one hour. Turning to Cicchini, he advised him that he should also get out of town and that his money would be returned later. The contractors made immediate preparations to leave Warren. They left and all work on the project ceased.

We apologize for the length of the preceding resume.

On October 13, 1961, the Grand Jury of Trumbull County for the September 1961 Term indicted Lamonge as follows:

1. Threatening to kill Eugene Brady with intent to extort money contrary to Section 2901.32 of the Revised Code.

2. Threatening to kill Al Cicchini with intent to extort money contrary to Section 2901.32 of the Revised Code.

3. Obtaining $10,000 by false pretenses contrary to Section 2907.21 of the Revised Code.

4. Corruptly attempting to influence a witness in the discharge of his duties, contrary to Section 2917.07 of the Revised Code.

Lamonge was arraigned on October 17, 1961, and entered a plea of not guilty to all four offenses charged in the indictment. Lamonge was granted time in which to attack the indictment in any method he deemed best.

On October 19, 1961, Lamonge demurred to the fourth count of the indictment. The demurrer was overruled on January 31, 1962, but as the fourth count of the indictment was dismissed during trial, we will not concern ourselves further with that phase of this cause.

On January 30, 1962, Lamonge filed three motions:

1. To dismiss the indictment because the September 1961 Grand Jury of Trumbull County was illegally selected.

2. To require the state to elect as to which count of the indictment it expected to proceed on at trial.

3. For a change of venue of the trial.

These motions were overruled January 31, 1962.

On January 31, 1962, the indictment was amended by adding the words, "in conspiracy with Frank Cickelli," to the third count of the indictment. The offense charged in this court, after amendment, was larceny by trick while in furtherance of a conspiracy.

Trial was started in the Common Pleas Court of Trumbull County on February 5, 1962. On February 11, 1962, the jury returned its verdict finding Lamonge guilty of the offenses charged in the first count (extortion as to Brady) and in the third count (larceny by trick while engaged in a conspiracy), and not guilty of the second count (extortion as to Cicchini). After journalization of the findings of the jury, a motion for a new trial was filed and subsequently overruled. Lamonge perfected this appeal. Lamonge urges the following assignments of error:

1. The court erred in overruling defendant's motion to dismiss the indictment returned against defendant for the reason that the panel of persons drawn to serve as grand jurors was not selected according to law and was improperly drawn.

2. The verdict and judgment of the jury was not substantiated by sufficient evidence and was contrary to the weight of the evidence.

3. The court erred in permitting the introduction by the state of evidence of conversations between witnesses and third parties at which defendant was not present, with no proper foundation laid or proof of conspiracy.

4. The court erred in sustaining the motion of the prosecution in moving the court and jury to the home of the state witness, Walter Pestrak, and in ordering the court, jury, and defendant to said home over the objection of the defendant.

5. The court errer in permitting the prosecuting attorney, over the objection of the defendant, to cross-examine the defendant as to matters completely collateral and not associated in any way with the crimes charged in the amended indictment.

6. The court erred in its charge to the jury.

7. Misconduct of the prosecuting attorney regarding his comments on the case while appeal was pending.

We will endeavor to pass upon each of the assignments of error in the order in which they are set forth. The first assigned error is not well taken, as it was not preserved. Before we are obliged to consider assignments of error the question must be properly raised in the trial court and preserved in such a manner as to bring it directly before us. Let us see what happened here. Lamonge was arraigned on October 17, 1961, at which time he was assured that he would be given three days in which to attack the indictment. This certainly was the place to begin if there was any question as to the selection or composition of the grand jury. There was no request by Lamonge to withdraw his plea and to tender a plea in abatement or challenge to the array. Instead, Lamonge demurred only to the fourth count of the indictment, whereby he was charged with tampering with a witness, on the ground that the indictment did not allege an offense punishable under the laws of the state of Ohio. Nothing further was done on this score until January 30, 1962, at which time Lamonge moved to dismiss the indictment (all four counts) because the indictment had been returned by an illegally chosen grand jury. The supporting authority for the motion was that:

"* * * in the case of the *State of Ohio* v. *Raymond Little,* Case No. 11628, this same court, had sustained a motion challenging the array from which the grand jury was selected."

No request to withdraw his plea was made. No hearing was had on the motion, none was requested; and no evidence was offered in support thereof. The motion was perfunctorily overruled on January 31, 1962.

The question re-appears in the bill of exceptions, as follows:

"Mr. Spain: Your Honor I would again like to renew our motion which the court has previously overruled dismissing the indictments against this defendant for the reason that the Grand Jury which rendered these indictments, that is the September Term of the Grand Jury was illegally selected as was ruled by this court in the State of Ohio v. Raymond Little.

"Court: Well I don't think that this court overruled that

Grand Jury was illegally selected, but the motion will be overruled. That motion will be overruled.

"Mr. Spain: I would like to correct my statement. That this court did not rule, that this court did rule that the array, the original array from which the Grand Jury had been selected, that is the jurors who had been selected from the jury wheel of which this Grand Jury was taken was illegal and improperly selected.

"Court: Well, the proceedings of this case have gone forward, and there was no challenge made to the array before or at the proper time in this case, and consequently again I must say to you I believe the motion is properly overruled.

"Mr. Spain: Well, Your Honor I might further say this. That was very true that a motion challenging that array of the Grand Jury was not made prior to the time they were sworn. However, the court must bear in mind that the indictments rendered by this Grand Jury were secret indictments, that Mr. Lamonge had no way of knowing that he was to be the subject of investigation, that he was to be considered by this Grand Jury, and consequently had no opportunity to challenge this array.

"Court: I believe that he had been indicted some weeks before he had been originally indicted, and remained on bond some weeks before he was required to plead to the indictment so that he had an opportunity to challenge the array had he desired to do so. These are all matters that is no use of our arguing.

"Mr. Spain: That's right.

"Court: These are matters which must depend on the record.

"Mr. Spain: That's right."

The issue again submerged and finally appears as the second ground in Lamonge's motion for a new trial.

This alleged error was not at any time properly presented to the trial court, either by challenge to the array or a plea in abatement. There is no shred of evidence or even argument as to what the impropriety in selection of the grand jury was. There is no means by which we may determine whether Lamonge was deprived of a fair trial or not. The urged error was not preserved. See Sections 2941.29, 2941.53, 2941.55, 2941.59

and 2953.01 to 2953.14, Revised Code; 3 Ohio Jurisprudence (2d), 61 *et seq.*, Section 200 *et seq.*; *State* v. *Schultz,* 96 Ohio St., 114; *State* v. *Tudor,* 154 Ohio St., 249; and *State* v. *Glaros,* 170 Ohio St., 471.

The next question presented is our old friend the weight and sufficiency of the evidence. In this case, as in all criminal cases, the evidence is in conflict, often directly so. The fact that conflict exists or that there is inconsistency in the testimony introduced by the state has never been grounds for reversal in Ohio. The true test is that the evidence to convict must be of such a nature that its character is sufficient to satisfy reasonable minds of the guilt of the defendant. These reasonable minds are those of the jury and not the minds of the reviewing court. There is ample evidence in this record to sustain any conclusion that may have been reached. The jury believed the evidence that established guilt on two counts and lack of guilt on the other count. The jury believed the evidence which dictated that result. To them it had probative characteristics; consequently, we cannot find that the evidence is insufficient or that the verdict is against the manifest weight of the evidence. This assignment of error is not well taken. See *State* v. *Shively,* 172 Ohio St., 128; same case in Court of Appeals, 86 Ohio Law Abs., 71; *State* v. *Lett,* 106 Ohio App., 285; *Sandoffsky* v. *State,* 29 Ohio App., 419, paragraphs one, two, three and four of the syllabus; and 3 Ohio Jurisprudence (2d), 820 *et seq.*, Section 821.

The order in which testimony is admitted is within the discretion of the trial judge and, in the absence of an abuse of this discretion, cannot be the basis for prejudicial error. It seems to us that this cannot be established in this trial. Perhaps some declarations were admitted prior to establishment of a prima facie case, but it was certainly not very premature. We feel that there can be no question that the existence of a conspiracy was established, which rendered the out-of-order admission of testimony, if any was so admitted, harmless and immaterial. There are numberless cases wherein the law has been declared to be as set forth above. We cite only the following landmarks: *Fouts* v. *State,* 7 Ohio St., 471, paragraph two of the syllabus; *Ralls* v. *State,* 43 Ohio App., 129, paragraph three of the syllabus, appeal dismissed 124 Ohio St., 660; *San-*

*doffsky* v. *State, supra* (29 Ohio App., 419), paragraphs four and five of the syllabus; *State* v. *Anthoulis,* 62 Ohio App., 113, paragraph four of the syllabus, appeal dismissed 135 Ohio St., 631; and *State* v. *DeRighter,* 145 Ohio St., 552, at page 557. In addition to the above cases, these texts are very helpful: 2 Wharton on Criminal Evidence (11 Ed.), 1198 *et seq.,* Section 712; and 3 Underhill's Criminal Evidence (5th Ed.), 1934 to 1937, Section 863. The third assignment of error is not well taken and, therefore, overruled.

The question raised by the fourth assignment of error is interesting from an academic point of view but certainly cannot be the basis for prejudicial error as we view it. We feel that the situation is analogous to that which the Legislature envisaged when Sections 2945.49 to 2945.55 of the Revised Code were enacted. These statutes provide one means by which the testimony of a deceased, absent, or sick witness may be obtained. It is certainly not the only method, as no exclusionary language is employed in the statutes. It guarantees the defendant in a criminal case two rights, namely, confrontation and cross-examination. These rights only apply to a living witness as we have in this case. There is no such guarantee as to a deceased witness. The greatest latitude is allowed to prove identification, which often is the most serious problem in criminal cases. In the session of the court at the home of former Mayor Pestrak conditions were not ideal. We grant this, but we also feel that they did not reach the pinnacle of confusion and bedlam described by the appellant. During that time, Lamonge was within a few feet of the witness and was afforded an opportunity to cross-examine. This he did in depth and detail. The trial judge was in the presence of the witness, the attorneys involved, and the court reporter. There is no provision in the statutes concerning testimony of absent or ill witnesses for the jury to see and appraise such witnesses. It is not even contemplated. We dare say that many of the jurors in Mayor Pestrak's home on February 8, 1962, saw a great deal more of the witness than they would have if a deposition had been used. We feel that no prejudicial error is raised by this assignment of error.

The next assignment of error could well be covered in our treatment of assignment No. VII concerning the question of misconduct of counsel. When you first examine the portion of

the bill of exceptions referred to in appellant's brief discussing assignment No. V, that is the implication created. Particularly is that true of that portion of the cross-examination by the assistant prosecuting attorney concerning a bombing in Niles; however, careful re-examination of the record leads to an entirely different conclusion. At the end of the state's case on February 8, 1962, this interesting statement appears:

"Mr. Spain: (at Bench): I move that starting tomorrow morning we have a separation of witnesses—starting tomorrow at nine o'clock.

"Mr. Griffith: I doubt if any witnesses have been in here.

"Mr. Spain: I don't want Cecil in here tomorrow morning. He is the F. B. I. man, and that's the only reason I am moving otherwise. I had no intention. I purposely kept from moving; as long as he walked in I changed my mind."

The foregoing clearly indicates that Lamonge had recently been questioned by the F. B. I. concerning a bombing in Niles. The prosecuting attorney obviously knew of this as did the attorney for Lamonge. On cross-examination, the prosecuting attorney attempted to lay the foundation for impeachment concerning this incident. Lamonge did not deny making certain statements to the F. B. I. agent, consequently, the agent could not be called on rebuttal to impeach. It is to be regretted that the questions had to be about an incident involving a bombing; however, that was not the fault of the state of Ohio. The other questions were proper, as they involved convictions for criminal activity in the past by Lamonge. To a certain extent all of us are pilloried by our past. The only thing we can do about this is to be sorry, either that we made the mistake and make amends, or be sorry that we were caught and continue our reprehensible conduct. The fifth assignment of error is not well taken.

For the sixth assignment of error Lamonge claims the court erred in its charge to the jury in that the instructions as given on aiding and abetting and the element of intent are not adequate or complete and that the court failed to give any instruction on motive or lack of motive. These alleged errors, if any, are errors of omission and not commission. The court's instructions must be considered as a whole, not by words, phrases, and clauses taken out of context. We have carefully

examined the charge of the court and have found no error of any consequence. This is especially true in the absence of any request for further instructions on any phase of the case. When counsel both for the state and the defendant were given an opportunity by the court to make such requests both answered in the negative. Motive is not an essential element of either offense of which the defendant was found guilty.

The only objection to the charge by the defendant was as follows:

"Mr. Spain: Give me general objections to the entire charge of the court."

We must always remember that to be error warranting reversal the error must be one of commission and not of omission. The sixth assignment of error is overruled.

The seventh and final assignment of error has to do with a public utterance made by the Prosecuting Attorney of Trumbull County to the Kiwanis Club of Girard, Ohio. The speech was made after the conviction of Lamonge in the Common Pleas Court. The cause was pending in this court on appeal. From a newspaper clipping appended to appellant's brief we gather that the speech was made on June 5, 1962. In the speech the prosecuting attorney complained about the rule prohibiting the use of illegally obtained evidence in criminal cases in courts, which often resulted in acquittals. The prosecuting attorney also played a tape recording of an alleged telephone conversation between Lamonge and Rocco Ferrera. This evidence you will recall pertained to the fourth count of the indictment charging the offense of tampering with a witness. That charge was dismissed and did not go to the jury.

The appellant relies entirely on the dicta of Judge Clark of the United States Circuit Court of Appeals, Second Circuit, in the case of *United States* v. *Bufalino*, 285 F. (2d), 408, at page 419. Careful examination of this case reveals that Judge Clark thought it *improper* for special prosecutors to write and speak about that notorious case while the appeal was pending. It was the famous "Appalachin Conference" case. This so-called misconduct of counsel was not even considered in the majority opinion of the court and was mentioned by Judge Clark in a concurring opinion, and then only in passing. It was labeled improper—never erroneous.

This court knew nothing of the situation in Trumbull County until September 17, 1962, when it sat in Warren to hear this appeal. We were not even aware of the sewer project, let alone any of the machinations of the individuals involved in this case. We did not know of the questioned speech until we read the clipping included in appellant's brief. It could have had no effect on the outcome of this cause. We feel that it is not misconduct on the part of the prosecuting attorney. The seventh assignment of error is not well taken.

This opinion is unduly long; however, we must write a dispositive paragraph. It seems redundant to say that this entire situation is a sad commentary on city officials and contractors alike—at least some officials of one city and officers of at least two contracting firms. The officials of the two construction companies were granted immunity under Section 2917.04, Revised Code. Two of these men did not seem to be strangers to the type of operation carried on in Warren. They helped make this situation possible. We realize that sewage handling is a dirty business in and of itself. It is not necessary, however, for all things connected therewith to be permeated with the malodorous malevolence which surrounded this tortured town's try toward elutriation.

We conclude that the appellant had a fair trial, even though it was under very trying circumstances. The appellant's attorney was a skilled practitioner who protected his client's rights at all times. The judgment herein appealed from is affirmed.

*Judgment affirmed.*

COLLIER and BROWN, JJ., concur.

RADCLIFF, P. J., COLLIER and BROWN, JJ., of the Fourth Appellate District, sitting by designation in the Seventh Appellate District.